# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| KIMBERLY MCGREGOR, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION H-09-2340 |
| | § | |
| UNITED HEALTHCARE SERVICES, INC., | § | |
| | § | |
| *Defendant.* | § | |

## MEMORANDUM AND ORDER

Pending before the court is defendant United Healthcare Services, Inc.'s motion for summary judgment (Dkt. 20). After review of the motions, the responses, and the applicable law, the  motion is GRANTED IN PART and DENIED IN PART. Specifically, summary judgment is granted with respect to McGregor's claim for hostile work environment, and denied with respect to her claims for disability discrimination and failure to accommodate.

## BACKGROUND

Plaintiff Kimberly McGregor, a thirty-old female, suffers from Polymyositis, an incurable muscle disease, which progressively weakens muscles, especially those in proximity to the torso. Dkt. 24 at 2. McGregor was employed by United Healthcare Services, Inc. ("United") as a customer care professional from January 28, 2008 to May 7, 2008. Dkt. 20 at 2, 7. McGregor's job required her to attend training sessions and subsequent on-the-job training for approximately three months. *Id.* at 3. After her training was complete, McGregor's position required her to respond to incoming calls from Medicaid and Medicare members and providers regarding various healthcare questions relating to benefits and claims. *Id.* at 3–4. McGregor's immediate supervisor on a daily basis was Karen Downey. *Id.* at 4. Downey's immediate supervisor was Melissa Wade, a business

manager.  *Id.*  Lesia Ford, another business manager, assisted when Melissa Wade was out of the office.  *Id.*  The business managers reported to Mark Riddlesworth, the site director.  *Id.*

McGregor alleges that United created a hostile work environment by denying her many requests for accommodations.  Dkt. 24 at 23.  For example, in response to McGregor's request for handicap access to the building and suite doors in her first interviews with United, both the recruiter and Downey told McGregor that they were sure something could be worked out.  *Id.* at 5–6.  Also, McGregor asked for a modified or part-time schedule in these initial interviews so that she could attend therapy.  Again, Downey purportedly told McGregor that something could be done.  *Id.* at 6.  However, United did not change McGregor's schedule until May 6, 2008—nearly three-and-a-half months after she began work at United, two weeks after her training ended, and the day after she first resigned—and the automatic door openers were not installed until after McGregor resigned.  *Id.* at 8, 19.

Additionally, McGregor alleges that she endured harassment when one of her supervisors, Lesia Ford, compared her shift request to Ford's wanting to take off to go shopping, to the movies, or to run errands.  *Id.* at 10, 26.  Finally, McGregor claims that she was constructively discharged when Downey gave her an unreasonable ultimatum: work the new part-time schedule with no more absences or be terminated.  *Id.* at 18, 26.

On May 7, 2008, the day after McGregor accepted the new part-time schedule, she withdrew her acceptance and sent a final resignation letter to Downey stating that she was leaving her position, she was thankful for the opportunities provided to her, and she appreciated being part of Downey's team.  Dkt. 20 at 12.  McGregor filed an EEOC charge on March 17, 2009, and subsequently filed this suit against United on July 24, 2009, alleging several claims under the Americans with

Disabilities Act ("ADA"): disability discrimination through her constrictive discharge, a hostile work environment, and failure to accommodate . Dkt. 24 at 22–23.  United moves for summary judgment on all claims.  Dkt. 25 at 1, 8, 11.

ANALYSIS

**A. Summary Judgment Standard**

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Carrizales v. State Farm Lloyds*, 518 F.3d 343, 345 (5th Cir. 2008).  The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; there must be an absence of any genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S. Ct. 2505 (1986).  An issue is "material" if its resolution could affect the outcome of the action.  *Burrell v. Dr. Pepper/Seven Up Bottling Group, Inc.*, 482 F.3d 408, 411 (5th Cir. 2007).  "[A]nd a fact is genuinely in dispute only if a reasonable jury could return a verdict for the non-moving party." *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006).

The moving party bears the initial burden of informing the court of all evidence demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986).  Only when the moving party has discharged this initial burden does the burden shift to the non-moving party to demonstrate that there is a genuine issue of material fact.  *Id.* at 322.  If the moving party fails to meet this burden, then it is not entitled to summary judgment and no defense to the motion is required.  *Id.*

"For any matter on which the non-movant would bear the burden of proof at trial . . . , the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718–19 (5th Cir. 1995); *see also Celotex*, 477 U.S. at 323–25. To prevent summary judgment, "the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348 (1986) (quoting FED. R. CIV. P. 56(e)).

When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-movant and draw all justifiable inferences in favor of the non-movant. *Envtl. Conservation Org. v. City of Dallas, Tex.*, 529 F.3d 519, 524 (5th Cir. 2008). The court must review all of the evidence in the record, but make no credibility determinations or weigh any evidence; disregard all evidence favorable to the moving party that the jury is not required to believe; and give credence to the evidence favoring the nonmoving party as well as to the evidence supporting the moving party that is uncontradicted and unimpeached. *Moore v. Willis Ind. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000). However, the non-movant cannot avoid summary judgment simply by presenting "conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation." *See TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). By the same token, the moving party will not meet its burden of proof based on conclusory "bald assertions of ultimate facts." *Gossett v. Du-Ra-Kel Corp.*, 569 F.2d 869, 872 (5th Cir. 1978); *see also Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1221 (5th Cir. 1985).

**B. The *McDonnell Douglas* Framework**

All ADA claims are subject to the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S. Ct. 1817 (1973). *See Raytheon v. Hernandez*, 540 U.S. 44, 50 n.3, 124 S. Ct. 513 (2003) (finding that *McDonnell Douglas* burden-shifting scheme applies to discriminatory-treatment cases including those under the ADA). *McDonnell Douglas* instructs that:

> The plaintiff must first establish a *prima facie* case of [discrimination] . . . . Once the plaintiff presents a *prima facie* case, the defendant must then articulate a legitimate, nondiscriminatory reason for the questioned employment action . . . . If the defendant is able to do so, the burden shifts back to the plaintiff to produce evidence that the defendant's articulated reason is merely pretext for discrimination.

*Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 957 (5th Cir. 1993); *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 40 (5th Cir. 1996).

In determining whether summary judgment is appropriate, courts should consider "the strength of the plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 148–49, 120 S. Ct. 2097 (2000).

**C. Disability Discrimination Claim**

To establish a *prima facie* case of disability discrimination, a plaintiff must show (1) she is disabled or is regarded as disabled; (2) she is qualified for the job; (3) she was subjected to an adverse employment action on account of her disability; and (4) she was replaced by or treated less favorably than non-disabled employees. *Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 511 (5th Cir. 2003).

5

It is undisputed that McGregor is a qualified individual with a physical impairment that substantially limits her in one or more major life activities.  Dkt. 20 at 2; Dkt. 24 at 2.  Thus, to satisfy her *prima facie* case of disability discrimination, McGregor must demonstrate that she suffered an "adverse employment action" and that she was "treated less favorably than non-disabled employees."  *Gowesky*, 321 F.3d at 511.

### 1. Adverse Employment Action

 The Fifth Circuit has held that only "ultimate employment decisions," such as hiring, granting leave, discharging, promoting, and compensating, satisfy the "adverse employment action" element of a *prima facie* case of discrimination.  *See Hunt v. Rapides Healthcare Sys., LLC*, 277 F.3d 757, 769 (5th Cir. 2001).  McGregor relies exclusively on the theory of constructive discharge to satisfy the adverse employment action requirement.  She therefore bears the burden to show that her working conditions were so intolerable that a reasonable person in her position would have felt compelled to resign.  *Pa. State Police v. Suders*, 542 U.S. 129, 147, 124 S. Ct. 2342 (2004).

An employee can prove constructive discharge by showing that she faced a choice between resigning or being fired.  *Faruki v. Parsons S.I.P., Inc.*, 123 F.3d 315, 319 (5th Cir. 1997).  In *Faruki v. Parsons*, the court found that an ultimatum existed when the plaintiff was told that he should find another job within one week.  *Id.*  In this case, McGregor claims that Downey gave her an ultimatum that, in effect, forced her to miss her regularly-scheduled physical therapy session in order to keep her job.  Dkt. 24 at 18.  Specifically, McGregor was told that if she missed the upcoming Wednesday for therapy, or any day for that matter, she would be fired.  *Id.*  This allegation is sufficiently synonymous with the ultimatum found in *Faruki* to constitute a constructive discharge.  *See Fauki*, 123 F.3d at 319.

6

United, however, argues that (1) McGregor was never given an ultimatum; (2) McGregor's resignation was voluntary; and (3) McGregor knew she did not have to resign—she could work her new modified schedule without further attendance issues.  First, Downey claims that she never told McGregor that she could either resign or be terminated.  Dkt. 20, Ex. B at 80.  Second, United argues that the record evidence rules out any constructive discharge claim because McGregor's final resignation email compliments Downey and thanks her for everything she has done.  *Id.* at 17–18; Dkt. 25 at 1–3.  United likens McGregor's case to *Boriski v. City of College Station* where the plaintiff, Wendy, sent a similar complimentary resignation letter.  65 F. Supp. 2d 493, 513 (S.D. Tex. 1999).  In her letter, Wendy wrote "I leave the City with no wrong doings or ill feelings," and on her Exit Interview Questionnaire, she checked the line labeled "Voluntary resignation," rather than "Discharged."  *Id.* at 512–13.  The court found this to be "strong evidence of a voluntary resignation" and "hardly indicative of an individual who has been repeatedly harassed and forced to resign."  *Id.* at 513.  Likewise, United urges the court to adopt the *Boriski* court's reasoning and find McGregor's positive resignation email indicative of a "voluntary resignation."  *Id.*

Lastly, United relies on *Chandler v. La Quinta Inns, Inc.* to support its contention that an employee who is given a performance objective to meet under a threat of termination does not establish a constructive discharge as a matter of law.  264 Fed. App'x 422, 425–26 (5th Cir. 2008).  This argument is unavailing, however, because Chandler and McGregor are not similarly situated.  Unlike the reasonable *performance* objective imposed on Chandler, United could not honestly believe that McGregor could remain employed without any further absences or tardies. Dkt. 24 at 27.  Perceiving United's ultimatum as a new attendance objective is unrealistic given the unpredictable nature of McGregor's disability.  *Id.*

Taking the facts in the light most favorable to McGregor, the court must assume that Downey communicated an ultimatum to McGregor. *Id.* at 18. Downey's alleged ultimatum was explicit, and McGregor clearly could not comply with it—as evidenced by McGregor's resignation the very next day. *Id.* at 19. Although McGregor's complimentary resignation email sheds a positive light on her employment with United and weighs against the ultimatum that Downey allegedly conveyed to her, a genuine issue nevertheless exists regarding the constructive discharge.

Notably, United does not offer a non-discriminatory reason for McGregor's adverse employment action because it contends that McGregor was not given an ultimatum or constructively discharged—rather, she voluntarily resigned. Dkt. 25 at 1, 5. Consequently, United fails to defeat the "adverse employment action" element of McGregor's *prima facie* discrimination case and, under the *McDonnell Douglas* test, a presumption of intentional discrimination still stands. *See Reeves*, 530 U.S. at 143.

### 2. Unfavorable Treatment

To satisfy the fourth prong of her *prima facie* disability discrimination case, McGregor must demonstrate that she was treated less favorably than other non-disabled employees. *Gowesky*, 321 F.3d at 511. The Fifth Circuit has held that to establish a *prima facie* case of discrimination, the plaintiff must show that other employees were treated differently under circumstances "nearly identical" to hers. *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1090 (5th Cir. 1995).

McGregor claims that (1) United openly favored non-disabled employees because Downey routinely excused tardies for other employees but not for McGregor, even though Downey knew that McGregor had trouble accessing the building and suite (Dkt. 24 at 11); and (2) United openly granted shift changes to her co-workers but not to her. *Id.* at 16. In a discussion with management

about shift changes during their training, McGregor and her co-workers were instructed to send an email requesting a half-hour lunch in order to get off work by 4:30 p.m. instead of 5:00 p.m. *Id.* at 15–16. After sending the email, however, McGregor was given a start time of 8:30 a.m. instead of 8:00 a.m., meaning she still had to work until 5:00 p.m. *Id.* at 16. McGregor asked Downey why she could not get off at 4:30 p.m. instead, and Downey responded that the shift change was not an option. *Id.* McGregor asked Downey a second time if she could get off work at 4:30 p.m. so that she could attend therapy—something Downey admitted to knowing—and she was again denied. *Id.* Nevertheless, McGregor observed two co-workers' shifts get adjusted to the 4:30 p.m. end time after Downey rejected her requests. *Id.*

United argues, however, that (1) Downey did not single McGregor out for discipline based on attendance problems; and (2) McGregor's email was not specific enough to notify United that she wanted to end work early in order to attend therapy. First, United claims that Downey fairly administered written discipline to nine other employees who also exhibited unsatisfactory attendance during the first six months of 2008. Dkt. 20 at 18. Moreover, United argues that Downey did not rush to discipline McGregor for attendance issues but instead only did so after McGregor accumulated more unplanned absences than necessary under company policy to warrant the level of discipline Downey imposed. *Id.* at n.35 & 59; Dkt. 25 at 6. Finally, United contends that when McGregor requested a thirty-minute lunch instead of an hour lunch, she failed to express her desire to leave work thirty minutes early in order to attend the last therapy session of the day. Dkt. 20 at 8, n.53. Thus, United maintains that it had no actual knowledge that McGregor wanted to change shifts in order to attend therapy or that she wished to end her shift earlier as opposed to beginning her shift later. *Id.* As a result, United argues that McGregor essentially received

preferential treatment because she was not disciplined as quickly as justified under company policy, and that United had no duty to grant McGregor's request to end work early because she never mentioned her reason for wanting to do so.  *Id.* at n.35, 53 & 59; Dkt. 25 at 6, 18.

McGregor's argument that United unfairly disciplined her is unpersuasive because Downey did not discipline her for every tardy, thereby exemplifying managerial discretion towards McGregor's unsatisfactory attendance just as she did for other non-disabled employees.  Dkt. 20 at n.35 & 59.  However, McGregor satisfies the fourth prong of her *prima facie* disability discrimination case if Downey in fact refused to change McGregor's shift but changed two other non-disabled employees' shifts, and did so despite her knowledge that McGregor wanted to end her shift early so that she could go to therapy.

Because McGregor established the fourth element of her *prima facie* case, United must articulate a legitimate, non-discriminatory reason for denying McGregor's schedule request.  *Bodenheimer*, 5 F.3d at 957.  United claims that it had no duty to accommodate McGregor's shift request because it was unaware that she wanted to get off work early so that she could attend therapy.  Dkt. 25 at 18.  However, it is not clear from the record if United knew of McGregor's intention to go to therapy.  Downey admits that she spoke with McGregor about ending her shift at 4:30 p.m., but she does not clarify if she knew *why* McGregor wanted that particular shift.  Dkt. 20, Ex. B at 114.  The record also does not reflect whether Downey granted the shift change for two other non-disabled employees after denying McGregor's same request.  Because United's proffered evidence on the issue is unclear, it has failed to satisfy its burden to defeat a presumption of disability discrimination.  *See Price v. Fed. Express Corp.*, 283 F.3d 715, 720 (5th Cir. 2002) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509, 113 S. Ct. 2742 (1993)) ("The

defendant's burden during the second step of *McDonnell Douglas* is satisfied by producing evidence, which, '*taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action.'").   Therefore, summary judgment on McGregor's disability discrimination claim is denied.

**D. Hostile Work Environment Claim**

To establish a *prima facie* case of hostile work environment, an employee must show that (1) she belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment was based on the employee's membership in the protected group; (4) the harassment affected a term, condition, or privilege of her employment; and (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action.  *See Celestine v. Petroleos de Venez*, 266 F.3d 343, 353 (5th Cir. 2001).  A plaintiff need not establish the fifth element if the alleged harasser is a supervisor with immediate or higher authority over the employee.  *Watts v. Kroger Co.*, 170 F.3d 505, 509 (5th Cir. 1999).

In determining whether a working environment is hostile or abusive, all circumstances must be considered, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S. Ct. 367 (1993).  The burden of establishing a hostile work environment is a heavy one.  "To survive summary judgment, the harassment must be 'so severe and pervasive that it destroys a protected classmember's opportunity to succeed in the workplace.'"  *Hockman v. Westward Commc'ns, LLC*, 407 F.3d 317, 326 (5th Cir. 2004) (quoting *Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871, 873 (5th Cir. 1999)).  In this respect, "[t]he alleged conduct must be more

than rude or offensive comments, teasing, or isolated incidents." *Id.* The "mere utterance of an epithet which engenders offensive feelings in an employee . . . does not sufficiently affect the conditions of employment to implicate Title VII." *Harris*, 510 U.S. at 21 (internal quotations omitted).

As a threshold matter, United seeks summary judgment on its affirmative defense that McGregor's harassment/hostile work environment claim is outside the scope of her EEOC charge, so she failed to exhaust administrative remedies as to that claim. Dkt. 20 at 13, n.88; Dkt. 25 at 9–10. However, "consistent with the remedial purposes of the ADA, a charge of employment discrimination must be construed with the 'utmost liberality.'" *Price v. Sw. Bell Tel. Co.*, 687 F.2d 74, 78 (5th Cir. 1982) (citing *Terrell v. U.S. Pipe & Foundry Co.*, 644 F.2d 1112 (5th Cir. 1981)). Thus, construing McGregor's EEOC charge with the "utmost liberality," it is sufficient to include a claim for hostile work environment, and McGregor successfully exhausted her administrative remedies as to that claim. *Id.*

On the merits, McGregor alleges that (1) Downey treated her less favorably than other non-disabled employees in terms of scheduling and attendance and tardy accounting; (2) Lesia Ford belittled her through degrading comparisons; (3) United denied her independent access to the building and suite; (4) supervisors, managers, human resources, and the site director ignored her many complaints; and (5) Downey threatened her with termination and thereby constructively discharged her. *Id.* at 31–32. McGregor contends that these instances of harassment affected a term, condition, or privilege of her work. *Id.* at 31.

In response, United simply argues that McGregor's testimony proves that she was never subject to any harassment, much less harassment that is severe or pervasive, as is required to establish a harassment claim under the ADA. Dkt. 20 at 13, n.88. For instance, McGregor testified

that she "liked working at United Healthcare," and that she was never the target of slurs, teased, or picked on because of her physical impairment.  Dkt. 25 at 10.  United also argues that the Fifth Circuit has affirmed summary judgment in far more severe cases of harassment than is evidenced here.  *Id.*  United relies upon *McConathy v. Dr. Pepper/Seven-Up Corp.* to show that McGregor's alleged harassment is simply not enough. 131 F.3d 558 (5th Cir. 1998).  In *McConathy*, the Fifth Circuit found the alleged harassment not severe or pervasive even though the plaintiff's supervisor was (1) unsupportive toward the plaintiff when she needed several surgeries; (2) became angry and said she had "better get well this time" when the plaintiff explained her need for additional surgery; (3) told the plaintiff he would no longer tolerate her health problems; (4) complained about plaintiff's extensive use of the company's benefits; (5) pressured the plaintiff to return to work before she recovered; (6) told plaintiff's co-workers to cease communicating with the plaintiff; (7) transferred assignments away from the plaintiff; and (8) refused to acknowledge the plaintiff's presence.  *Id.* at 563–64.  Thus, United argues that McGregor's alleged harassment, as in *McConathy*, is not the type of extreme conduct that would prevent her from succeeding in the workplace.  Dkt. 25 at 11.

Initially, McGregor's allegations that United failed to make reasonable accommodations and that United constructively discharged her are not examples of actionable harassment, which requires disability-based discrimination, intimidation, ridicule, and insults.  *See Walker v. Thompson*, 214 F.3d 615, 625 (5th Cir. 2000).  Turning to the allegations regarding Ford, McGregor claims that Ford responded to her in an elevated tone that her wanting to take off of work on Wednesdays for physical therapy or to see a doctor was like Ford's wanting to take off to go shopping, to the movies, or to run errands.  Dkt. 24 at 10.  While it is apparent that Ford's comment was based on McGregor's disability, the harassment constitutes an "isolated incident[ ]"

13

that fails to meet the "severe and pervasive" standard. *See Hockman*, 407 F.3d at 326. Furthermore, it is far from clear that this one incident evinces harassing conduct that could alter "the conditions of [McGregor's] employment and create an abusive working environment." *See Harris*, 510 U.S. at 21.

McGregor's other allegations of harassment also fail to support her hostile work environment claim. McGregor has failed to cite any commanding proof that her written warnings for her attendance problems were based on her disability given the fact that Downey did not strictly enforce the attendance policy on McGregor *because of* her extenuating circumstance; and Downey similarly disciplined nine other non-disabled employees for attendance issues during the first six months of 2008. Dkt. 20 at 7–8, 18–19. Likewise, McGregor's allegation that upper management ignored her complaints does not amount to harassment because it is not "so severe and pervasive" to affect her opportunity to succeed in the workplace. *See Hockman*, 407 F.3d at 326. Moreover, McGregor neglects to prove that United's unresponsiveness stems from her disability.

McGregor's claim involves far less objectionable circumstances than those for which the Fifth Circuit affords relief. *See Farpella-Crosby v. Horizon Health Care*, 97 F.3d 803, 806 (5th Cir. 1996). Therefore, McGregor has not established that the harassment was "so severe and pervasive" that it affected a "term, condition, or privilege" of employment. *See Hockman*, 407 F.3d at 325–26. Because McGregor has failed to establish a *prima facie* case of hostile work environment, United defeats a presumption of discrimination under *McDonnell Douglas* and is thus entitled to summary judgment on McGregor's hostile work environment claim.

**E. Failure to Make a Reasonable Accommodation Claim**

The ADA requires employers to provide "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an

14

applicant or employee" unless doing so "would impose an undue hardship" to the employer.  42

U.S.C. § 12112(b)(5)(A); *Barber v. Nabors Drilling U.S.A., Inc.*, 130 F.3d 702, 706 (5th Cir.

1997).  The term "qualified individual with a disability" means "an individual with a disability

who, with or without reasonable accommodation, can perform the essential functions of the

employment position that such individual holds or desires." *See* 42 U.S.C. § 12111(8).  The term

"reasonable accommodation" may include making existing facilities used by employees readily

accessible and usable by individuals with disabilities and granting part-time or modified work

schedules. *Id.* § 12111(9).

    The employer's obligation to provide a reasonable accommodation is triggered by the

employee's request for an accommodation. *See Taylor v. Principal Fin. Group, Inc.*, 93 F.3d 155,

165 (5th Cir. 1996) (citing the ADA's implementing regulations).  The responsibility for fashioning

a reasonable accommodation is shared between the employee and the employer through an

"interactive process." *Cutrera v. Bd. of Supervisors of La. State Univ.*, 429 F.3d 108, 112 (5th Cir.

2005).  The ADA prohibits discrimination on the basis of disability and requires reasonable

accommodations, but does not require an employer to take affirmative action in favor of people

with disabilities or to create a new job for them.  *See, e.g.*, *Foreman v. Babcock & Wilcox Co.*, 117

F.3d 800, 808–10 (5th Cir. 1997); *Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090, 1094 (5th Cir.

1996).

    First, McGregor alleges that she requested accommodations, including a modified or part-

time schedule and making United's facilities readily accessible to disabled persons, on three

different occasions prior to beginning her employment with United (at her typing assessment and

two interviews).  Dkt. 24 at 5, Ex. A at ¶ 10.  Allegedly, McGregor was assured that something

could be worked out at every occasion.  *Id.*  Second, McGregor concedes that United requested an

automatic door opener be installed in response to a hand injury she sustained while trying to access the suite. Dkt. 24 at 8. However, McGregor points out that the automatic door opener was not installed until after she resigned. *Id.* Third, McGregor alleges that even the most senior director at United, Mark Riddlesworth, although aware of her difficulty in accessing the suite, ignored her plea for help. *Id.* Fourth, McGregor draws attention to United's motion in which it states that "regular attendance is an essential function of most jobs." Dkt. 27 at 2; Dkt. 25 at 15 (citing *Hypes v. First Commerce Corp.*, 134 F.3d 721, 727 (5th Cir. 1998)). Thus, McGregor alleges that United's failure to modify her shift and make the building and suite accessible during her approximate four-month employment prevented her from performing an essential function of the job—attendance. Dkt. 27 at 2. Finally, McGregor contends that she provided United with the medical information it requested in order for her accommodations to be made, but that United never responded back to her. Dkt. 27 at 4–5.

In response, United contends that (1) McGregor's failure to accommodate claim is not actionable because it does not adversely affect a term, condition, or privilege of employment; (2) McGregor admits that United *did* make reasonable accommodations to her by accommodating her request to change her work schedule the day before she resigned; (3) United had no duty to make any accommodations to McGregor because she never provided any medical proof to show the accommodations were necessary; (4) McGregor specifically represented in writing that she could work any shift, 24 hours a day, 7 days a week, and 365 days a year; and (5) McGregor understood that United was not able to accommodate special scheduling requests but, as business needs changed, there may be opportunities to change schedules. Despite all of this, United claims that it nonetheless made accommodations for McGregor on two different occasions—once on April

16

21, 2008, when it changed McGregor's one-hour lunch to a half-hour lunch, and once on May 6, 2008, when it changed McGregor's full-time schedule to a part-time schedule.  Dkt. 20 at 8–10.

No accommodation requested by McGregor seems unreasonable.  For example, the accommodations did not require a large sum of money—it is undisputed that the $ 2,375.00 it would cost to install an automatic door opener was not an undue burden on United.  Dkt. 24 at 10. Significantly, United admitted that it never asked its landlord to modify the entrance doors with automatic door openers.  *Id.* at 7; Dkt. 20, Ex. B at 103 & Ex. N at 51.  In addition, contrary to what it represented to McGregor, United *could* modify her training schedule.  Dkt. 27 at 3.  Apparently, United had no reason to deny McGregor's schedule request during her training because it ultimately did so—at no irreparable harm to United—but only after McGregor attempted the schedule (missing doctors appointments and therapy) for three months.  *Id.*  Therefore, in light of the provisions of the ADA and relevant case law, McGregor's requested accommodations were reasonable and would not impose an undue hardship on United.  *See* 42 U.S.C. § 12111(9); *Barber*, 130 F.3d at 706.

Because the ADA demands that employers make the same accommodations that McGregor requested, and because United was aware of McGregor's limitations and request for these accommodations from their very first encounter with her, a genuine issue exists regarding a failure to accommodate.  Accordingly, McGregor has established a *prima facie* case for failure to accommodate and United's proposed non-discriminatory reasons for denying those accommodations are far from compelling.  Therefore, summary judgment is denied on this claim.

## CONCLUSION

For the reasons states above, United's motion for summary judgment is GRANTED IN PART and DENIED IN PART. Specifically, summary judgment is granted with respect to McGregor's claim for hostile work environment, and denied with respect to her claims for disability discrimination and failure to accommodate.

It is so ORDERED.

Signed at Houston, Texas on August 6, 2010.

_____
Gray H. Miller
United States District Judge